# In the United States District Court for the Southern District of Georgia Brunswick Division

|  |  |  |
|---|---|---|
| AQUA LOG, INC., a Georgia Corporation, | : : | CIVIL ACTION |
| Plaintiff/Salvor, | : | |
| v. | : | |
| LOST AND ABANDONED PRE-CUT LOGS AND RAFTS OF LOGS lying on the bottom of a navigable river within one (1) nautical mile of a point located at 31° 38.939′ North Latitude and 81° 47.650′ West Longitude | : : : : : | |
| In Rem Defendant. | : | |
| STATE OF GEORGIA, | : | |
| Interested Party. | : | NO. CV207-036 |

## ORDER

Plaintiff/Salvor, Aqua Log, Inc. (hereinafter "Aqua Log"), filed the above-captioned case against in rem defendant, "Lost and Abandoned Pre-Cut Logs and Rafts of Logs" (hereinafter "the logs"), under the Salvage Act, 46 U.S.C. § 721. Invoking the Court's admiralty jurisdiction, Aqua Log seeks title to, or in the alternative a salvage award for, the logs. The State of Georgia has intervened as an interested party and asserts it is the rightful owner of

the logs.  Presently before the Court is the State's motion to dismiss Aqua Log's complaint due to a lack of subject matter jurisdiction.  According to the State, the Court "lacks subject matter jurisdiction over these proceedings by reason of the Eleventh Amendment to the United States Constitution."  State's Motion to Dismiss at 1.  Because the Court finds that the State was not in "actual possession" of the res at the time it was seized, the State's motion to dismiss Aqua Log's complaint for lack of subject matter jurisdiction will be **DENIED.**

**BACKGROUND**

According to Aqua Log, during the nineteenth and twentieth centuries, commercially harvested logs were transported to coastal markets by rafting those logs down Georgia's rivers and streams.  Plaintiff's Response to State's Motion to Dismiss at 2.  A consequence of this practice was that "approximately 5% of these logs sank to the bottom" of Georgia's waterways.  Id.  These sunken logs are more valuable than modern lumber due to their unique characteristics, such as their uniquely tight growth rings.  Id.  This has resulted in an increased interest in salvage,

or "dead-head," logging, a practice used to recover these "old growth logs."  Id.  Salvors engaged in deadhead logging lift these logs from the waterways, and check their growth rings.  Id.  The logs with tight growth rings are then removed.  Id.

One of the waterways containing these deadhead logs is the Altamaha River.  The Altamaha River "flows more than 130 straight-line miles from its northernmost points to its entry into the Atlantic Ocean north of Brunswick."  Altamaha River, New Georgia Encyclopedia (Univ. Of Ga. Press), available at http://www.georgiaencyclopedia.org.

The State of Georgia has claimed ownership of these deadhead logs since at least the late 1950's.  In a 1958 opinion, the Georgia Attorney General opined that "[r]iver beds and sunken timber in navigable streams are state property."  Op. Attorney General 1958-59, p. 220.  In 1985, the Georgia General Assembly enacted a statutory scheme to deal with the issue of ownership of the deadhead logs.  These statutes grant title to, and control over, the deadhead logs to the State and its various agencies.  Under one of these statutes, the Georgia Department of Natural Resources (hereinafter "DNR") was named "[t]he custodian of

all submerged cultural resources" and was "empowered to promulgate such rules and regulations as may be necessary to preserve, survey, protect, and recover such underwater properties . . . ." Ga. Code Ann. § 12-3-81 (2008). In a separate statute, the General Assembly required that "[a]ny person desiring to conduct investigation, survey, or recovery operations, in the course of which any part of a submerged cultural resource may be endangered, removed, displaced, or destroyed, shall first make application to [DNR] for a permit to conduct such operations." Ga. Code Ann. § 12-3-82(a) (2008).[1]

In 1998, the DNR appointed a Submerged Timber Task Force (hereinafter "STTF") "to review issues associated with the commercial removal of submerged timber (deadhead logs)

---

[1]In 2005, the Georgia General Assembly specifically removed deadhead logs from the definition of "submerged cultural resources" as that phrase is used in §§ 12-3-81 and 12-3-82 and passed a new statute, Ga. Code Ann. § 12-3-82.1, which specifically dealt with deadhead logs and under which the DNR was mandated to "exercise control over the State's 'deadhead' logs . . . and establish a program whereby persons interested in investigating, surveying or recovering such logs would be required to first apply for and receive a permit from DNR before commencing such activities." State's Motion to Dismiss at 8. However, this new statute was repealed as of January 1, 2008. Therefore, deadhead logs appear to again fall under the purview of §§ 12-3-81 and 12-3-82. At oral argument, the State of Georgia argued, and Aqua Log has not disputed, that the deadhead logs at issue fall under the definition of "submerged cultural resources" referred to in those code sections.

from Georgia waters." Exhibit A to Plaintiff's Response to State's Motion to Dismiss at 1. As part of its study of deadhead logging, "the STTF asked DNR to survey the Altamaha River and estimate how many logs were on the bottom of the river." Id. at 5. The Wildlife Resources Division of the DNR then contracted with the United States Navy "to survey the Altamaha River using sidescanning sonar and interpret the results." Id. This survey--which covered twenty-two miles of the Altamaha--was conducted in September 2000. Id. Partly as a result of this survey, which "revealed that there was a relatively low number of submerged logs and, consequently, very limited economic return," id., the STTF advised the DNR against removing the submerged logs. Id. at 7-8. First, the STTF opined that "[t]he removal of submerged logs may . . . have an impact on the navigability of rivers." Id. at 8. The STTF went on to state that "[t]he importance of submerged logs may play a vital role to the physical integrity of many Georgia rivers," id. at 10, and that removal of the logs "could lead to a decline in the economic value of" Georgia's recreational and commercial fisheries. Id. at 11. Due, at least in part, to the STTF's recommendations, the State of Georgia has not attempted to

remove the deadhead logs from the Altamaha, but has taken other steps in an attempt to assert control and ownership over the logs.

As part of its regular business, and without applying for or receiving a permit under Georgia's statutory scheme, Aqua Log located the logs at issue in this case, which it claims were "lying on, but not embedded in, lands beneath the navigable waters of the Altamaha River."[2]  Plaintiff's Response to State's Motion to Dismiss at 3 (emphasis in original).  Upon locating the logs, Aqua Log planned to first "determine ownership/identity of the original logger from 'brands' which may exist on individual logs."  Verified Complaint at ¶ 6.

According to Aqua Log, "[u]nless the Court rules that such logs were abandoned by their owners, the logs remain the property of the original owner or heirs, regardless of their location, embedded or not embedded."  Id.  Further,

---

[2] At one point during oral argument, counsel for Aqua Log stated that, contrary to its written submissions, Aqua Log seeks title to embedded logs as well.  Counsel for the State argued that the State is entitled to those logs both embedded in the river bottom as well as those simply lying on top of the riverbed.  The Court need not clear up this confusion, however, because a determination of whether the logs in question are embedded is not relevant in deciding whether the State can avail itself of Eleventh Amendment immunity.

Aqua Log stated that it would "not salvage individual logs
embedded in the river bottom without having first received
written permission from the original owner or heirs (if
ownership of an embedded log can be determined)." Id. at ¶
7. In the event that the owners or heirs are found, Aqua
Log asks the Court to grant "a full and liberal salvage
award" and, if the owners or heirs are not found, Aqua Log
seeks title to the logs. Id. at ¶ 9. In its complaint,
Aqua Log requests the Court to "assume exclusive
jurisdiction over the salvage" and to put Aqua Log "into
possession of the In Rem Defendant." Id. at 4.


**Procedural History**

Aqua Log filed its complaint on March 13, 2007. On the
same day, in response to Aqua Log's request, and pursuant to
Local Admiralty Rule 2, Magistrate Judge James E. Graham
issued an order directing the issuance of a warrant of
arrest for the logs. The Magistrate Judge mandated that
"[d]uring the seizure process, for safety reasons, the U.S.
Marshal(s) on site shall have full control over the premises
and all persons present and any persons present shall abide
the authority and directions of the U.S. Marshal(s)." Order

-7-

Directing Issuance of Warrant of Arrest at 1. Pursuant to the Magistrate Judge's order, the Clerk issued a seizure warrant, which called for the seizure of one of the submerged deadhead logs. See Seizure Warrant.

After the warrant was issued, counsel for Aqua Log, as a courtesy, contacted counsel for the State of Georgia and informed him where and when the seizure was to take place. Counsel for the State then contacted the U.S. Marshal's office and arranged for the presence of himself and other State representatives at the seizure. On March 19, 2007, two days prior to the seizure of the representative log, counsel for the State sent a letter to counsel for Aqua Log advising him "as to the State's ownership, possession and control of the In Rem Defendant, and of the requirement that Plaintiff first apply for and obtain a permit from DNR . . . before undertaking any action to investigate, survey or recover the In Rem Defendant." State's Motion to Dismiss at 9. The letter also advised Aqua Log's counsel that the State had been in contact with the Marshal's Office and had arranged for representatives of the State to be present at the time of the seizure. Id.

The Process Receipt and Return filed by the U.S.
Marshal shows that the seizure of the representative log
occurred on March 21, 2007.  See United States Marshals
Service, Process Receipt and Return.  Several individuals
representing the State of Georgia were present during the
seizure, including an Assistant Attorney General, DNR
officers, and a state biologist.  Id.

Less than one week later, on March 27, 2007, the State
filed a Statement of Right, in which it asserts that it has
the exclusive right to possess and own the logs in question.
Statement of Right at ¶ 5.  Further, the State claims that
the logs in question "are not lost, but rather, that the
State of Georgia has been aware of their existence for quite
some time, and has, through statutory and regulatory means,
continually exerted possession and control over same since
before Plaintiff ever commenced this action."  Id.  The
State also notes that it had already "confirmed the actual
geographical location of the logs in question via sonar and
other technological means."  Id.

Significantly, the State noted that it was not
consenting to adjudication of its right in the res but
instead was making an appearance "for the limited purpose of

-9-

providing notice of its claim of rights of possession and ownership to the subject logs and/or rafts of logs, for the purpose of receiving notice of proceedings in this matter, and for the purpose of challenging . . . the Court's jurisdiction in this matter, all without waiving its sovereign immunity to suit in federal court pursuant to the Eleventh Amendment to the United States Constitution." Id. at ¶ 4.

The State raised its Eleventh Amendment immunity defense in its answer, and elaborated on this defense in its motion to dismiss Aqua Log's complaint. Again making it clear that it is appearing before the Court for the limited purpose of contesting the Court's jurisdiction over the matter, the State, in its motion to dismiss, argues that the Eleventh Amendment to the United States Constitution bars the Court's consideration of Aqua Log's complaint and, therefore, that the complaint should be dismissed for lack of subject matter jurisdiction. Aqua Log, on the other hand, argues that the Court's exclusive jurisdiction over this action is established by Supreme Court precedent and prays that the State's motion be denied.

**DISCUSSION**

**I.** **Eleventh Amendment and *In Rem* Admiralty Cases**

Although the judicial power of the federal courts extends "to all cases of admiralty and maritime Jurisdiction," U.S. Const. art. III, § 2, cl.1, this jurisdiction is limited by the Eleventh Amendment. That Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.

As the Supreme Court has noted, "[t]he Court has not always charted a clear path in explaining the interaction between the Eleventh Amendment and the federal courts' in rem admiralty jurisdiction." Calif. & State Lands Comm'n v. Deep Sea Research, Inc., 523 U.S. 491, 502 (1998). In Deep Sea Research, the Court noted that, in early cases, it was "assumed that federal courts could adjudicate the in rem disposition of the bounty even when state officials raised an objection." Id. In fact, early cases uniformly held that the Eleventh Amendment did not even apply in an admiralty suit, because such a suit was not a "suit in law

or equity," an apparent qualifier found in the text of the Eleventh Amendment. See, e.g., United States v. Peters, 9 U.S. (5 Cranch) 115, 139-140 (1809).

However, the Supreme Court abandoned this reasoning in Ex Parte New York, 256 U.S. 490 (1921) (hereinafter "New York I"), and Ex Parte New York, 256 U.S. 503 (1921) (hereinafter "New York II"). In New York I, the Court held that "admiralty and maritime jurisdiction is not wholly exempt from the operation of the Eleventh Amendment . . . ." Deep Sea Research, 523 U.S. at 503 (quoting New York I, 256 U.S. at 497). Since New York I was decided, the fact that the Eleventh Amendment applies in admiralty cases has never seriously been contested, although it has not always been clear exactly how the Amendment should be applied in such cases.

In recent years, the Supreme Court, in a series of cases, has elaborated on the interplay between the Eleventh Amendment and in rem admiralty cases. As explained below, the Supreme Court has developed three requirements that a State must meet before it can avail itself of Eleventh Amendment immunity in such cases. While the briefs submitted by the parties seem to suggest that the Supreme

-12-

Court has developed a "three-prong test," see, e.g. State's

Motion to Dismiss at 4, the Court has never actually

presented the requirements in this fashion.[3]  Nevertheless,

a complete and careful analysis of the cases makes clear

that these three considerations must be present before the

State may avail itself of Eleventh Amendment immunity: The

State must not have consented to the court's jurisdiction,

and the State must assert a "colorable claim" to, and have

"actual possession" of, the res.  Only after satisfying all

three requirements can a State avail itself of Eleventh

Amendment immunity.  Each of these requirements is addressed

below.

**A.  State Consent and Waiver of Eleventh Amendment Immunity**

First, the Court rejects Aqua Log's argument that the

State has consented to the Court's jurisdiction and thereby

waived its Eleventh Amendment immunity.  As the State notes

--------

[3]Nor does this Court believe that a "three-prong" test would
necessarily be helpful to the analysis.  Supreme Court Justice
Ruth Bader Ginsburg has expressed her "disdain" of such tests in
a recent interview with author and legal scholar Bryan Garner.
Justice Ruth Bader Ginsburg, United States Supreme Court,
Interview with Bryan Garner on Legal Research and Writing (Part
2), available at http://www.lawprose.org/supreme_court.php.  In
the interview, Justice Ginsburg cautions against the use of
multi-prong tests, noting that such tests often give a "false
sense of security."  Justice Ginsurg notes that often, decisions
are made on other grounds and fitted into these prongs.

in its reply brief, "the State's involvement in this matter
is not voluntary, and the State has specially appeared
herein . . . as and only to the extent necessary to put the
Court on notice of its asserted rights and interest in the
res, and to comply with various filing and discovery
deadlines . . . so as to avoid any prejudice to the State's
asserted rights in the res . . . ." State's Reply Brief at
12.

The Court agrees with the State that "[s]uch limited
involvement by the State, with no request for affirmative
relief from this Court with respect to its rights in the
res, does not constitute a consent by the State to
adjudication of its rights in the res by this Court." Id.
In College Savings Bank v. Florida Prepaid Postsecondary
Education Expense Board, the Supreme Court held that the
"'test for determining whether a State has waived its
immunity from federal-court jurisdiction is a stringent
one.'" 527 U.S. 666, 675 (1999) (quoting Atascadero State
Hospital v. Scanlon, 473 U.S. 234, 241 (1985)). The Court
went on to hold that waiver should only be found where the
State either "voluntarily invokes [federal-court]
jurisdiction" or "makes a 'clear declaration' that it

intends to submit itself to [federal-court] jurisdiction."
Id. at 675-76 (quoting Great Northern Life Ins. Co. v. Read,
322 U.S. 47, 54 (1944)).

In this case, the State has neither voluntarily invoked
federal-court jurisdiction nor made a "clear declaration"
that it intends to submit itself to such jurisdiction.
Instead, the State has appeared before the Court only to put
the Court on notice of its asserted rights to the logs in
question, and to challenge the Court's jurisdiction over the
matter.  The State has been extremely careful not to submit
to the Court's jurisdiction or waive its Eleventh Amendment
immunity.  If the Court were to find that the State's
actions in this case constituted a waiver of its Eleventh
Amendment immunity, any plaintiff could avoid the strictures
of the Eleventh Amendment simply by filing an in rem suit
against the State's property in federal court, thereby
forcing the State to intervene as an interested party.  This
would essentially nullify the Eleventh Amendment.
Accordingly, the Court concludes that the State of Georgia
has not waived its Eleventh Amendment immunity defense.

## B.  The "Colorable Claim" Requirement

Next, in order to avail itself of Eleventh Amendment immunity, a state must assert "a colorable claim to possession" of the res.  Fla. Dep't of State v. Treasure Salvors, 458 U.S. 670, 697 (1982).  The central holding of Treasure Salvors has been widely cited by federal courts, including courts in this District.  See, e.g. Chance v. Certain Artifacts Found and Salvaged from the Nashville a/k/a The Rattlesnake, 606 F. Supp. 801, 803 (S.D. Ga. 1984); Jupiter Wreck, Inc. v. The Unidentified, Wrecked and Abandoned Sailing Vessel, 691 F. Supp. 1377 (S.D. Fla. 1988); Maritime Underwater Surveys, Inc. v. The Unidentified Wrecked and Abandoned Sailing Vessel, 717 F.2d 6 (1st Cir. 1983).  However, the circuits are split as to exactly how a state can satisfy the colorable claim requirement and what burden the state should bear.  This divergence remains because the United States Supreme Court in Treasure Salvors did not rule on what a state must do to satisfy this requirement, but instead held that it was "apparent" that the State in that case did not have a colorable claim to the res in question because it was found in international, and not state, waters.  458 U.S. at 694.

Several courts, including the Sixth and Ninth Circuits, have interpreted the colorable claim requirement as imposing a burden on the State to prove that its claim is colorable by a preponderance of the evidence. See, e.g. Deep Sea Research v. The Brother Jonathan, 102 F.3d 379, 386 (9th Cir. 1996), aff'd in part, vacated in part sub nom. Calif. V. Deep Sea Research, 521 U.S. 491 (1998); Fairport Int'l Exploration, Inc. v. Shipwrecked Vessel, known as Captain Lawrence, 105 F.3d 1078 (6th Cir. 1997)("Fairport II"), vacated and remanded on other grounds, 523 U.S. 1091 (1998).

One of the courts imposing this preponderance standard was the Ninth Circuit in Deep Sea Research. Although the Supreme Court vacated in part the Ninth Circuit's opinion in that case, it did not express any opinion on the preponderance standard adopted by the lower court. The Court did not reach this issue because it held that the State in that case did not have actual possession of the res in question. Deep Sea Research, 523 U.S. at 504. The preponderance approach was also followed by the Sixth Circuit in Fairport II. Although the Supreme Court also vacated and remanded that case in light of its opinion in Deep Sea Research, see 523 U.S. 1091, it did not expressly

disapprove of the Sixth Circuit's use of the preponderance standard. As a result, the preponderance standard seems to remain the law in the Sixth Circuit. See, e.g., Fairport Int'l Exploration v. Shipwrecked Vessel, Captain Lawrence, 177 F.3d 491 (6th Cir. 1999).

Other courts, including the First and Seventh Circuits, have held that a State need only make a "bare assertion" of ownership of the res in order to meet the colorable claim requirement. Mar. Underwater Surveys, Inc. (1st Cir.); Zych v. Wrecked Vessel Believed to be the Lady Elgin, 960 F.2d 665 (7th Cir. 1992). For instance, in Maritime Underwater Surveys, the First Circuit held "that when a state asserts title to antiquities lodged within the seabed under its authority, the Eleventh Amendment bars federal adjudication of the state's interest, absent its consent." 717 F.2d at 8. See also Zych, 960 F.2d 665, 670 ("[I]t is the existence, and not the strength, of the claim that activates the eleventh amendment.").

Although the Eleventh Circuit has not ruled on this issue, at least one district court in the Circuit has cited Maritime Underwater Survey--and its holding that a bare assertion of ownership of the res is enough to satisfy the

colorable claim requirement--with approval.  See Jupiter

Wreck, Inc. v. Unidentified, Wrecked & Abandoned Sailing

Vessel, 691 F. Supp. 1377, 1384 (S.D. Fla. 1988).  Also, in

Chance, the court cited Treasure Salvors as standing for the

proposition that "once a state asserts a colorable claim to

property, a federal court does not have the authority to

adjudicate the state's interest in that property without the

state's consent."  606 F. Supp. at 803.[4]

Both of these approaches are problematic.  The Court

appreciates the State's argument that the preponderance

approach followed by the Sixth and Ninth Circuits would in

_____

[4]Although this language from Maritime Underwater Survey and
Chance might be misinterpreted as meaning that a State need only
satisfy the colorable claim and consent requirements, and that a
Court need not inquire into the actual possession requirement,
this reading would be in direct conflict with the Supreme Court's
decision in Deep Sea Research, where the Supreme Court expressly
held that a State must be in actual possession of the res in
order to avail itself of Eleventh Amendment immunity. 523 U.S. at
504.  The courts in Maritime Underwater Survey and Chance cited
Treasure Salvors for these propositions.  In Deep Sea Research,
the Supreme Court held that while "[i]t is true that statements
in the fractured opinions in Treasure Salvors might be read to
suggest that a federal court may not undertake in rem
adjudication of the State's interest in property without the
State's consent, regardless of the status of the res . . .
[t]hose assertions . . . should not be divorced from the context
of Treasure Salvors and reflexively applied to the very different
circumstances presented by this case.  In Treasure Salvors, the
State had possession -- albeit unlawfully -- of the artifacts at
issue."  Id. at 505-506.  In other words, the Court in Treasure
Salvors did not discuss the actual possession requirement because
that requirement was not at issue in that case.

-19-

large part defeat the purpose of the Eleventh Amendment by requiring the State to adjudicate its right to the res. In Deep Sea Research, the State of California made a similar argument before the Ninth Circuit, arguing that "if it had actually to prove the merits of its claims, then it would effectively be robbed of immunity." Deep Sea Research, 89 F.3d at 685-86.

California instead argued that all that was necessary to trigger Eleventh Amendment immunity was for it to make a bare assertion that it had a colorable claim. Id. The Ninth Circuit, however, was not persuaded by the State's concerns and held that "[f]or a federal court to renounce jurisdiction over an admiralty case on the basis of a mere assertion of entitlement to immunity on the part of the State is inconsistent with the court's duty to assess whether it has jurisdiction." Id. at 686. The Ninth Circuit went on to hold that "Eleventh Amendment immunity . . . should be treated as an affirmative defense, which must be proved by the party that asserts it and would benefit from its acceptance." Id. at 687.

Conversely, the Court also appreciates Aqua Log's argument that the bare assertion standard adopted by the

First and Seventh Circuits is inappropriate because, if all the State had to do was merely assert that it had a colorable claim to the res, federal courts could essentially be divested of subject matter jurisdiction in every in rem admiralty case. A "colorable" claim would become essentially any claim made by a state. The Sixth Circuit shares this concern, and has held that adoption of the bare assertion standard would "tie the hands of the federal court, and turn over jurisdictional determinations to the parties." Fairport II, 105 F.3d at 1084. See also Deep Sea Research, 89 F.3d at 686 (9th Cir.)(holding that adopting bare assertion standard would allow state to "receive immunity by asserting that it was entitled to it" and that this "is inconsistent with the court's duty to assess whether it has jurisdiction.").

Although both parties present very real and legitimate concerns, and while the Court is dissatisfied with aspects of both the preponderance standard and the bare assertion standard, the facts of this case make resolution of the issue clear. Here, the Court need not select which standard is appropriate because it is satisfied that even under the more demanding preponderance standard, the State would

clearly meet its burden of establishing that it has a colorable claim to the deadhead logs.

There are several facts that support the Court's conclusion that the State has asserted a colorable claim over the deadhead logs in question. First, and perhaps most compelling, is the fact that these deadhead logs are located on (and some are possibly even embedded in) land owned by the State of Georgia. In fact, Aqua Log acknowledges that the State of Georgia owns the lands beneath the Altamaha River. Verified Complaint at ¶ 7 ("The State of Georgia is the owner of the lands beneath the navigable waters of the Altamaha River . . . .").

While the res' location on State-owned land does not necessarily mean that the State "actually" possesses these logs, it does indicate that the State might "constructively" possess them, because the State would arguably have the right to exert physical control over objects resting on its land. See United States v. Derose, 74 F.3d 1177, 1185 (11th Cir. 1996) (holding that "[c]onstructive possession exists when a person 'has knowledge of the thing possessed coupled with the ability to maintain control over it or reduce it to his physical possession even though he does not have actual

-22-

personal dominion.'" (quoting <u>United States v. Wynn</u>, 544
F.2d 786, 788 (5th Cir. 1977)); <u>see also</u> <u>United States v.</u>
<u>Poindexter</u>, 176 Fed. Appx. 957, 958 (11th Cir. 2006)
("Constructive possession exists when a defendant has
ownership, dominion, or control over an object itself or
dominion or control over the premises . . . in which the
object is [located]."). The fact that the State might
constructively possess the logs supports the State's
argument that it has a colorable claim over them.

Another fact supporting the conclusion that the State
of Georgia has a colorable claim to the deadhead logs is
that Congress, in The Submerged Lands Act of 1953
(hereinafter "SLA"), has vested in the State "title to and
ownership of the lands beneath navigable waters within the
boundaries of the respective States, <u>and the natural</u>
<u>resources within such lands and water</u> . . . ." 43 U.S.C. §
1311(a)(1)(emphasis added). While the parties disagree as
to whether these logs would be considered a "natural
resource" under the SLA, it is at least arguable that these
logs would fall under the statute's definition of that
term.[5] This in and of itself would be enough to give the

---

[5] The SLA defines "natural resource" as including, "<u>without</u>
<u>limiting the generality thereof</u>, oil, gas, and all other

-23-

State a colorable claim over these logs.  This is because ownership over of a thing is almost always enough to acquire constructive possession over it.  Poindexter, 176 Fed. Appx. at 958, supra.

The statutory scheme passed by the Georgia legislature also supports the conclusion that the State has a colorable claim over the logs.  As discussed above, the statutes appoint the DNR to be the custodian of "all submerged cultural resources," and empowers the DNR to "promulgate such rules and regulations as may be necessary" to preserve and protect those resources.  Ga. Code Ann. § 12-3-81.

The Georgia statutes also set up a permitting scheme under which any person "desiring to conduct investigation, survey, or recovery operations, in the course of which any part of a submerged cultural resource may be endangered,

---

minerals, and fish, shrimp, oysters, clams, crabs, lobsters, sponges, kelp, and other marine animal and plant life but does not include water power, or the use of water for the production of power."  43 U.S.C. § 1301(e)(emphasis added).  Because the SLA's definition of "natural resource" was, by its own terms, not meant to limit the generality of that term, it might be helpful to look at the term's dictionary definition.  Webster's dictionary defines "natural resources" as "materials . . . supplied by nature."  Webster's Third New Int'l Dictionary 1507 (1993).  While trees are undoubtably "supplied by nature," it has been argued that, once the trees are cut into logs, they no longer fall under this definition.  See, e.g. In Re Tortorelli, 66 P.3d 606, 610 (Wash. 2003).  However, the Court need not resolve this dispute because, at the least, the SLA provides the State with a colorable claim over the logs.

removed, displaced, or destroyed," must apply for and be granted a license from the DNR. Ga. Code Ann. § 12-3-82(a). While the existence of these statutes, alone, might not be enough to meet the colorable claim requirement, together with the factors mentioned above, the statutes support the conclusion that the State has a colorable claim to the logs.

Aqua Log argues that Georgia's statutory scheme is unconstitutional because it intrudes upon federal legislation regulating admiralty and salvage matters. The Court disagrees. In <u>Askew v. American Waterways Operators, Inc.</u>, the Court held that:

> "[A] State, in the exercise of its police power, may establish rules applicable on land and water within its limits, even though these rules incidentally affect maritime affairs, provided that the state action 'does not contravene any acts of Congress, nor work any prejudice to the characteristic features of the maritime law, nor interfere with its proper harmony and uniformity in its international and interstate relations.'"

411 U.S. 325, 339 (1973) (quoting <u>Just v. Chambers</u>, 312 U.S. 383, 390 (1941)). Georgia's statutory scheme does not unconstitutionally intrude upon federal laws governing admiralty and maritime matters.

In support of its argument that the Georgia statutes are unconstitutional, Aqua Log cites a Florida district

court's opinion in <u>Cobb Coin Co., Inc. v. The Unidentified and Abandoned Sailing Vessel</u>, 549 F. Supp. 540 (S.D. Fla. 1982) (hereinafter "<u>Cobb Coin II</u>"), where the court found that certain Florida statutes regulating salvage were preempted by federal salvage law.  However, the Florida statutes struck down in <u>Cobb Coin II</u> were different from the Georgia statutes at issue here in several important respects.  <u>See</u> <u>Cobb Coin II</u>, 549 F. Supp. at 548-49.  First, the Florida statutory scheme required a license "to be able to explore the navigable waters for abandoned or derelict property," which the court in <u>Cobb Coin II</u> found to be in contravention of maritime law.  <u>Id.</u> at 548.  The Georgia statute at issue here is significantly more narrow, and requires a license only when a "submerged cultural resource" might be "endangered, removed, displaced, or destroyed." Ga. Code Ann. § 12-3-82(a).

Next, the Florida statutes at issue in <u>Cobb Coin II</u> permitted a licensee "the exclusive right to salve an area regardless of the licensee's diligence or success, whereas the law of maritime salvage or finds protects a salvor's right to uninterrupted possession of a project only where the salvor exercises due diligence and is reasonably

successful in saving the subject property." Cobb Coin II,
549 F. Supp. At 548. Because the Georgia statutory scheme
at issue in this case does not provide for the granting of
any "exclusive" right to salve, this is simply not a concern
here.

Finally, the court in Cobb Coin II noted that the
Florida statutes set up a "system of fixed salvor
compensation," which the court held conflicted "with the
flexible maritime law's flexible method of remuneration
based on risk and merit." Id. Because the Georgia statutes
at issue in this case do not set up the same system of fixed
compensation as the Florida statutes struck down in Cobb
Coin II, this is also not a concern in the present case.

The Court finds the Florida district court's more
recent decision in Jupiter Wreck to be more instructive in
this case. In Jupiter Wreck, the District Court held that
certain Florida statutory provisions, similar to the Georgia
provisions at issue in this case, were consistent with
federal law and, therefore, constitutional. 691 F. Supp.
at 1386-90. The Florida statutes at issue in Jupiter Wreck
granted the State title to "all treasure trove, artifacts,
and such objects having intrinsic or historical and

archeological value" and required "that permits be obtained for the research of historic sites on state lands." Id. at 1386-87. The court in <u>Jupiter Wreck</u> concluded that these statutes were, in fact, constitutional and held that "[t]here can be little doubt that the federal law of salvage is not meant to implicitly pre-empt the state power to regulate the use of its lands by establishing permit and licensing requirements." Id. at 1388. Like the court in <u>Jupiter Wreck</u>, this Court finds that the Georgia statutes at issue here are not in conflict with federal law and are therefore constitutional.

It is important to note that, at this juncture, the Court need not, and does not attempt to, decide whether the State of Georgia is entitled to exclusive possession and/or ownership over the deadhead logs in question. Instead, it is enough for purposes of the present motion for the Court to conclude that the State has asserted a colorable claim to the logs.

## C.  The "Actual Possession" Requirement

Lastly, in order to avail itself of Eleventh Amendment immunity, the State must prove that it was in "actual possession" of the res. The Davis, 77 U.S. (10 Wall.) 15

(1869).  In The Davis, the Court held that "proceedings in rem to enforce a lien against property of the United States are only forbidden in cases where, in order to sustain the proceeding, the possession of the United States must be invaded under process of the court."  Id. at 20.  Although The Davis dealt specifically with sovereign immunity as it relates to the federal government, the rule laid out in that case applies with equal force when it comes to Eleventh Amendment immunity and state government.[6]

The Court in The Davis went on to hold that the possession necessary for purposes of sovereign immunity "must be an actual possession, and not that mere constructive possession which is very often implied by reason of ownership under circumstances favorable to such implication."  The Davis, 77 U.S. (10 Wall.) at 21 (emphasis added).  Although the Court did not provide a concise definition of "actual possession," it did attempt to clarify

_____

[6]See Deep Sea Research, 523 U.S. at 506-7 ("In considering whether the Eleventh Amendment applies where the State asserts a claim in admiralty to a res not in its possession, this Court's decisions in cases involving the sovereign immunity of the Federal Government in in rem admiralty actions provide guidance, for this Court has recognized a correlation between sovereign immunity principles applicable to States and the Federal Government.").

what would constitute actual possession in this context:

> We are speaking now of a possession which can only
> be changed under process of the court by bringing
> the officer of the court into collision with the
> officer of the government, if the latter should
> choose to resist.  The possession of the government
> can only exist through some of its officers, using
> that phrase in the sense of any person charged on
> behalf of the government with the control of the
> property, coupled with its actual possession.

Id.  The central holding of The Davis--that the government

must actually possess the res at issue before it can claim

immunity from suit--remains in effect today.  In Deep Sea

Research, the Court cited The Davis and held:

> While this Court's decision in The Davis was issued
> over a century ago, its fundamental premise remains
> valid in in rem admiralty actions, in light of the
> federal    courts'    constitutionally    established
> jurisdiction in that area and the fact that a
> requirement that a State possess the disputed res in
> such cases is "consistent with the principle which
> exempts the [State] from suit and its possession
> from disturbance by virtue of judicial process."

Deep Sea Research, 523 U.S. at 507 (quoting The Davis, 77

U.S. (10 Wall.) at 21).  The Court in Deep Sea Research went

on to conclude that Eleventh Amendment immunity was not

available to the State in that case because the State had

not even made a claim of actual possession of the res.  Id.

at 506.

In this case, the Court must decide whether the State of Georgia has actual possession of the deadhead logs to determine whether it may avail itself of Eleventh Amendment immunity. In its briefs, the State argues that it does have actual possession of the logs in question. State's Motion to Dismiss at 5. To support its argument, the State cites The Davis and, in particular, the Supreme Court's language in that case defining actual possession as "a possession which can only be changed under process of the court by bringing the officer of the court into collision with the officer of the government, if the latter should choose to resist." 77 U.S. (10 Wall.) at 21 (emphasis added). The State interprets this language from The Davis to mean that:

> [I]f in an attempt to serve process upon the res in an in rem admiralty action, the court process server comes face-to-face with an agent of a sovereign state that is charged with control of the res, so as to bring about the potential for a "collision" between the two (should the agent attempt to resist the process), the sovereign state will be deemed to be in "actual possession" of the res, sufficient to defeat the federal court's jurisdiction over the res.

State's Motion to Dismiss at 7-8 (emphasis added).

The State claims that it has actual possession of the logs in question, because at the time the United States Marshal executed its warrant of arrest for the logs, several

-31-

state officials, including law enforcement officers and a state biologist, were near the location of the logs. Id. at 9. The State argues that "[t]here can be no doubt that under these circumstances the State was, at the time of the seizure, and still is in 'actual possession' of the In Rem defendant under the authority provided in The Davis." Id. at 10. The State goes on to explain its position by arguing that:

> This is so because the Marshall's [sic] service of process upon/seizure of the representative log of the In Rem Defendant was able to occur only after bringing the U.S. Marshall face-to-face with the representatives of DNR (the agency charged with controlling the In Rem Defendant), thereby creating the potential for a "collision," should the DNR representatives have decided to resist the process in violation of the Court's . . . Order.

Id. (emphasis added).

Aqua Log, on the other hand, argues that the State was not, and still is not, in actual possession of the logs in question and, therefore, may not avail itself of Eleventh Amendment immunity. Plaintiff's Response at 7-10. While Aqua Log acknowledges that State officials were, in fact, near the location of the logs at the time the representative log was seized by the Marshal, it counters the State's "collision" argument by noting that:

> [T]here was <u>absolutely nothing</u> preventing the
> Plaintiff from conducting the seizure without the
> presence of State officers or agents.  Obviously,
> the Plaintiff could have obtained and executed the
> warrant without the presence of officials from the
> State.  No "collision" between officers of the court
> and officers of the government was required.  Thus,
> the presence of the officers of the State was not
> the <u>only</u> way in which possession could be changed,
> if in fact the State had any possession <u>at all</u>,
> which the Plaintiff denies.

<u>Id.</u> at 8-9 (emphasis in original).

Aqua Log goes on to argue that the only possession the State had of the logs, if it had any at all, was "constructive possession," which, under <u>The Davis</u>, is clearly insufficient for purposes of Eleventh Amendment immunity.  <u>Id.</u> at 10.  Aqua Log asserts that the State never had the actual possession required under <u>The Davis</u> and, therefore, cannot avail itself of Eleventh Amendment immunity.  <u>Id.</u>

The Court rejects the State's argument that it was in actual possession of the logs because representatives of the State were near the location of the logs when the Marshal seized a representative log pursuant to the Magistrate's order.  Although the Court in <u>The Davis</u> did hold that actual possession occurs where a "collision" between the court process server and the state government is necessary to

-33-

effectuate seizure of the res, it is not enough under this reasoning that there was a potential for such a collision, as in the present case.  Rather, The Davis makes it clear that the Court was only referring to situations where possession could "only be changed" by bringing about such a collision.  The Davis, 77 U.S. (10 Wall.) at 21 (emphasis added).

As Aqua Log points out, this case does not present a situation where such a collision between the Marshal and state officials was necessary to effectuate seizure of the deadhead logs.  As Aqua Log notes, it could have "obtained and executed the warrant without the presence of officials from the State."  Plaintiff's Response at 8.  In fact, as previously discussed, it was counsel for Aqua Log that informed the State of the time and place of the seizure, therefore allowing the State to arrange for the presence of State representatives.  Aqua Log also argues that "[f]or the Court to rule that the State's presence in this regard somehow allows the State to meet the requirement of actual possession would only force the Plaintiff to file another action and seek to seize a representative log without notifying the State of Georgia until after the seizure had

occurred." <u>Id.</u> at 9. The Court need not discourage cooperation between salvors and state officials, thereby encouraging salvors to seize the <u>res</u> in the dark of night without the State's knowledge. Because the reasoning in <u>The Davis</u> only applies where a collision between federal and state officials is <u>necessary</u> to effectuate such seizure, the Court rejects the State's argument.

Yet, this does not necessarily resolve whether the State was in "actual" possession of the logs at the time of the seizure. The Court could, if appropriate, reject the State's collision argument and still conclude that it was in possession of the logs. In order to resolve the issue of actual possession in this case, the Court must first decide what constitutes actual possession. As mentioned previously, neither the Supreme Court, nor any other court, has offered a clear definition of "actual possession" in this context.[7]

---

[7]The difficulty of determining what exactly the State would have to do in order to actually posses a <u>res</u> is illustrated by the oral argument before the United States Supreme Court in <u>Deep Sea Research</u>. While the attorney for Deep Sea Research was discussing the actual possession requirement from <u>The Davis</u>, the Court inquired as to what a state would have to do in order to acquire such possession. For instance, one Justice asked whether it would be enough if the state "had located [the <u>res</u>], and had sent a diver down affixing a sign saying, claimed by the State." Transcript of Oral Arg., <u>Deep Sea Research</u>, at 19. Another

However, upon reviewing a wide variety of legal authorities, it becomes clear that "actual" possession, as opposed to "constructive" possession, requires the possessor to perform an act of physical control over the thing being possessed. Although the Court in <u>The Davis</u> did not provide a concise definition of actual--as opposed to constructive-- possession, legal treatises from the same time period clearly indicate that actual possession includes a purposeful and physical dimension. For example, in his 1888 treatise, "Possession in the Common Law," British law professor Frederick Pollock notes that, while "'[a]ctual possession' as opposed to 'constructive possession' is . . . an ambiguous term . . . [i]t is most commonly used to signify <u>physical control</u>, with or without possession in law." Frederick Pollock & Robert Samuel Wright, Possession in the Common Law 27 (Oxford Univ. Press 1888)(emphasis added). Professor Pollock also uses the phrase "<u>de facto</u> possession," which is used interchangeably with actual possession, and describes one of the elements of <u>de facto</u>

---

Justice asked whether it would be enough if the State did not send a diver down but just went and "drop[ped] a big rock" on the <u>res</u>. <u>Id.</u> The Court did not resolve these issues because it found that the State in that case did not, under any standard, possess the <u>res</u> in question.

possession as "[p]hysical control, detention . . . an actual relation between a person and a thing."  Id. at 26.

Professor Pollock's treatise is not the only legal authority suggesting that the phrase "actual possession" requires the possessor to exert physical control over the thing possessed.  The Supreme Court in Compania Espanola de Navegacion Maritima, S.A. v. The Navemar, 303 U.S. 68 (1938), interpreted The Davis as standing for that very proposition.

In The Navemar, a Spanish corporation brought an in rem admiralty suit in a federal district court against a Spanish steamship, seeking to recover possession of the ship.  Id. at 70.  The Spanish government then filed a motion similar to the one filed by the State of Georgia in this case, claiming that the ship was the property of the Spanish government and challenging the jurisdiction of the court. Id.  In order to decide whether the circuit court was correct in dismissing the suit, the Supreme Court had to determine whether the Spanish government was in possession of the ship in question.  Id. at 75.

As part of its analysis of the possession question, the Court in The Navemar cited The Davis and interpreted it as

requiring "actual possession by some act of physical dominion or control . . . ." Id. (emphasis added). Because the Court in The Navemar found that there was no evidence of such physical dominion or control, it concluded that the Spanish government was not in actual possession of the ship and reinstated the suit. Id. at 75-76.

In contrast to actual possession, courts have held that "[c]onstructive possession exists when a person 'has knowledge of the thing possessed coupled with the ability to maintain control over it or reduce it to his physical possession even though he does not have actual personal dominion.'" Derose, 74 F.3d at 1185 (quoting Wynn, 544 F.2d at 788). Although the court in Derose was dealing with a criminal statute, its decision is nevertheless instructive in this context.[8]

Numerous other courts have defined "actual possession" as requiring an act of physical control by the possessor. For instance, in Churchill v. Onderdonk, the New York Court of Appeals stated:

---

[8] See also Poindexter, 176 Fed. Appx. at 958 ("Constructive possession exists when a defendant has ownership, dominion, or control over an object itself or dominion or control over the premises . . . in which the object is [located].").

> Actual possession, as a legal phrase, is put in opposition to the other phrase, possession in law, or constructive possession. Actual possession is the same as <u>pedis possessio</u> or <u>pedis positio</u>, and these mean a foothold on the land, an actual entry, a possession in fact, a standing upon it, an occupation of it, <u>as a real demonstrative act done</u>. It is the contrary of a possession in law, which follows in the wake of title, and is called constructive possession.

59 N.Y. 134, 136 (1874) (emphasis added). Although the court in <u>Churchill</u> was obviously referring to possession of land rather than possession of chattel, it supports the notion that actual possession requires the possessor to perform an act of physical control over the thing being possessed. Likewise, the Alabama Supreme Court, in <u>Southern Railway Company V. Hall</u>, expressed a similar view of actual possession:

> Actual possession, or possession in fact, exists when the thing is in the immediate occupancy of the party, or his agent or tenant, synonymous with <u>pedis possessio</u>. Constructive possession, a possession in law, it is sometimes called, is that possession which the law annexes to the legal title or ownership of property, when there is a right to the immediate actual possession of such property, but no actual possession.

41 So. 135, 135 (Ala. 1906) (internal citations omitted).

<u>Hall</u> is helpful in that it distinguishes between situations where one might be said to "possess" something because he has the right to immediately possess that thing

(which would be properly classified as constructive possession), and situations where one is actually physically possessing the thing at that moment (which would be properly classified as actual possession).

Similarly, contemporary legal sources suggest that "actual possession" requires some sort of physical control. Black's Law Dictionary, for example, defines actual possession as "[p]hysical occupancy or control over property." Black's Law Dictionary 1201 (8th ed. 2004). Similarly, in United States v. Nenadich, 689 F. Supp. 285, 288 (S.D.N.Y. 1988), a District Court in the Southern District of New York held that "[a]ctual possession is what most of us think of as possession -- that is, having physical custody or control of an object."

As discussed, The Davis defined actual possession as "a possession which can only be changed under process of the court by bringing the officer of the court into collision with the officer of the government, if the latter should choose to resist." 77 U.S. (10 Wall.) at 21 (emphasis added). It is hard to imagine a situation where the changing of possession would necessarily bring about such a collision other than where the res is being physically

possessed by an agent of the State when a federal officer comes to seize it.

Turning to the facts of this case, the Court concludes that the State of Georgia did not, and does not, have actual possession of the deadhead logs in question.[9] Although the State has taken steps to claim title to, and the right to possess, the logs, there is no indication that the State has ever exerted physical control over them. In particular, the actions the State has taken in relation to the deadhead logs were to locate the logs using sonar technology, pass a statutory scheme asserting ownership and control over the logs, and send DNR boats to patrol the river.[10] While this might be enough to acquire constructive possession over the

_____

[9]While the present motion was pending, the United States District Court for the Middle District of Georgia decided a similar case, which was also initiated by Aqua Log and concerned deadhead logs located on the bottom of the Flint River. Aqua Log v. Lost and Abandoned Pre-Cut Logs and Rafts of Logs, No. 1:07-CV-208 (M.D. Ga. Sept. 30, 2008). In that case, the court concluded that the State of Georgia did not have actual possession of the logs. Id. at 3. In particular, the court held that the Georgia statutes dealing with the deadhead logs were irrelevant to the question of actual possession. Id. The court also held that a mere "potential for collision" between federal and state officials was not enough to constitute actual possession under The Davis. Id. at 4.

[10]The State acknowledged to the Court during oral argument that the DNR boats were not sent on patrol specifically to protect the deadhead logs, but that this was just one of the many reasons for such patrols.

logs, and is enough in combination with the other factors to constitute a colorable claim to the logs, it is not enough to constitute actual possession for purposes of Eleventh Amendment immunity.

At best, the State had the <u>right</u> to physically possess the logs if it so chose to do so, but having never exercised that right and having never taken physical control of the logs, it cannot be said that the State acquired actual possession over them for Eleventh Amendment immunity purposes.  As noted above, having the right to physically possess something is more properly classified as constructive possession, which is clearly not sufficient for purposes of the Eleventh Amendment under <u>The Davis</u>.

The State has suggested that it is in actual possession of the logs because the logs are lying on the riverbed, which Aqua Log acknowledges is State-owned property.  This argument, however, again ignores the distinction between actual and constructive possession.  As previously discussed, while the presence of an object on State-owned land might certainly suggest that the State has the right to exercise physical control over the object, it does not mean that the State actually possesses that object, which

requires the actual and immediate assertion of physical
control.  See Poindexter, 176 Fed. Appx. at 958.  This point
is made clear by Deep Sea Research, where the res at issue
was located on State-owned land but where the Supreme Court
nevertheless concluded that the State did not actually
possess the res.  Deep Sea Research, 523 U.S. at 504.
Further, in The Davis, the Court held that "[t]he possession
of the government can only exist through some of its
officers . . . ."  The Davis, 77 U.S. (10 Wall.) at 21.
This clearly suggests that, in order to obtain actual
possession, State officials must exert physical control over
the res.  Therefore, the fact that the logs in question may
be lying on State-owned land is not determinative of actual
possession.

It is important to note that the Court's conclusion
that the State is not in actual possession of the logs
simply means that the State cannot avail itself of Eleventh
Amendment immunity and, therefore, must submit to the
Court's jurisdiction.  The Court's holding does not
necessarily mean that Aqua Log has any right to the logs in
question.  As this case progresses, the State will have
ample opportunity to show that it has the right to possess

and/or own the logs.  In doing so, any evidence of the State's constructive possession of the logs will surely be relevant.[11]

**CONCLUSION**

The Supreme Court's decision in <u>The Davis</u> clearly requires the State to show that it actually possesses the <u>res</u> in question before it can avail itself of Eleventh Amendment immunity in <u>in rem</u> admiralty actions such as this. Here, the State of Georgia has simply failed to make this showing.  Some may call <u>The Davis</u> old; others venerable. Regardless of the preferred age adjective, however, <u>The Davis</u> is binding Supreme Court precedent.  Some day the Supreme Court may hold constructive possession to be sufficient, but it is not the role of this Court to ignore or overrule 100 year old Supreme Court precedent, or

---

[11]The State has suggested that this holding will put it in an awkward position of having to choose between seizing the logs (and risk disturbing the State's fisheries and the river's navigability) or forfeiting the right to the logs.  However, the Court's conclusion means only that the State will have to submit to this Court's jurisdiction to adjudicate its rights in the <u>res</u>. While this may not be ideal for the State, it is the resolution called for under the law as set forth in <u>The Davis</u> and its progeny.

collapse the distinction between actual and constructive possession in a way the Supreme Court has not yet done.[12]

Once again, the Court does not decide who owns title to the logs in question, whether the State can or should remove the logs from the Altamaha, or whether Aqua Log can or should do the same. Nor does this result, as required by Supreme Court precedent, suggest that any party has or will prevail on the merits. Instead, the Court deals only with whether it is proper to resolve the parties' claims in federal court.

For all of reasons outlined above, it is proper to resolve this dispute in federal court. Accordingly, the State of Georgia's motion to dismiss Aqua Log's complaint

---

[12]To be sure, some Supreme Court Justices have indicated their willingness to reconsider The Davis' distinction between actual and constructive possession when the proper case presents itself. For instance, in his concurring opinion in Deep Sea Research, which was joined by Justices Ginsburg and Breyer, Justice Kennedy opines that the Court's discussion of Treasure Salvors in Deep Sea Research "does not embed in our law the distinction between a State's possession or nonpossession for purposes of Eleventh Amendment analysis in admiralty cases." Deep Sea Research, 523 U.S. at 510 (Kennedy, J., concurring). Justice Kennedy goes on to say that "it ought to be evident that the issue is open to reconsideration." Id. Justice Stevens' concurring opinion in that case also indicates his willingness to abandon this age-old distinction. 523 U.S. at 509-510 (Stevens, J., concurring). However, until the United States Supreme Court abandons the distinction between actual and constructive possession set forth in The Davis, it is not the province of this Court to do so.

due to lack of subject matter jurisdiction is **DENIED**.  Doc.

No. 20.

    **SO ORDERED** this   21st   day of October, 2008.

_____
JUDGE, UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA